**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

MATTHEW B.,[1]
    Plaintiff,

        v.                                          Civil No. 3:22-cv-00285 (REP)

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,
    Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Plaintiff's application for disability insurance benefits under the Social Security Act ("Act"). Plaintiff was fifty years old at the time of his application and previously worked as a truck driver. (R. at 288, 330.) Plaintiff alleges he is unable to work due to rheumatoid arthritis, hypertension, and osteoarthritis. (R. at 313.)

On October 8, 2021, an Administrative Law Judge ("ALJ") issued a decision finding Plaintiff not disabled. (R. at 13.) This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[2]

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

1

Plaintiff now seeks review of the ALJ's decision. (Pl.'s Mot. Summ. J. (ECF No. 15).) For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 15) be GRANTED, Defendant's Motion for Summary Judgment (ECF No. 17) be DENIED, and the final decision of the Commissioner be REVERSED and REMANDED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on September 14, 2018, alleging disability beginning November 30, 2015. (R. at 288.) The SSA denied Plaintiff's claim on October 18, 2018, and again upon reconsideration on August 8, 2019. (R. at 140, 151.) Plaintiff requested a hearing before an ALJ, and a hearing was held on September 24, 2020, where Plaintiff, represented by an attorney, appeared and testified along with a vocational expert. (R. at 71-108, 217.) On November 3, 2020, the ALJ issued a written opinion denying Plaintiff's application for benefits. (R. at 165-179.) Subsequently, Plaintiff appealed this decision, and the SSA Appeals Council remanded the case to another ALJ on February 24, 2021. (R. at 184-88.)

At the second hearing on June 30, 2021, Plaintiff testified before an ALJ again. (R. at 109-139.) On October 8, 2021, the ALJ issued a written opinion, holding that Plaintiff was not disabled under the Act. (R. at 16-31.) On February 17, 2022, the SSA Appeals Council denied Plaintiff's request for review of the ALJ's decision, rendering it the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial

evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current

3

work activity. *Id.* § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. *Id.* § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. *Id.* § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite his physical and mental limitations. *Id.* § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform his past work given his residual functional capacity. *Id.* § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. 20 C.F.R. § 404.1520(e). However, if the claimant cannot perform his past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. *Id.* § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 18-30.) *See* 20 C.F.R. § 404.1520(a); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 30, 2015, the alleged onset date. (R. at 19.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "joint dysfunction at the knees and hips; osteoarthritis; degenerative disc disease of the lumbar and cervical spine;

4

rheumatoid arthritis (RA); gastrointestinal issues/ulcers and obesity (20 CFR 404.1520(c))." (R. at 19.) At step three, the ALJ determined that none of these impairments, individually or in combination, met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.)

The ALJ then determined Plaintiff's residual functional capacity. (R. at 20.) Based on the evidence in the record, the ALJ determined that Plaintiff retained the ability to perform light work, as defined in 20 CFR § 404.1567(b), except he can:

> Occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally kneel, stoop, crouch, and crawl; unlimited reaching; able to handle frequently bilaterally; fingering and feeling unlimited; an occasional sit/stand option, while remaining productive at the workstation; walking limited to 15-minutes at a time; and he would be off-task 10% of the day due to pain, in addition to regular breaks.

(R. at 20.)

The ALJ explained that she determined Plaintiff's residual functional capacity after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including the medical opinions and prior medical findings, in accordance with the regulations. (R. at 20.) Based on her residual functional capacity findings, the ALJ concluded at step four that Plaintiff was not able to perform his past relevant work. (R. at 28.)

At step five the ALJ found that there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. at 29.) In reaching this conclusion, the ALJ considered the testimony of a vocational expert, who opined that Plaintiff could perform the requirements of occupations such as price marker, collator operator, and mail sorter. (R. at 29.) As a result, the ALJ determined that Plaintiff is not disabled under the Act. (R. at 30.)

IV. ANALYSIS

Plaintiff alleges the ALJ erred by: (1) improperly assessing Plaintiff's subjective complaints of pain; (2) failing to account for Plaintiff's need for an assistive walking device in the residual functional capacity assessment; and (3) failing to incorporate in her findings all of the limitations expressed in the medical opinion submitted by Plaintiff's treating physician, Latisha Murray, M.D. ("Dr. Murray"). (Pl.'s Mem. Supp. Mot. Summ. J. at 1 (ECF No. 16) ("Pl.'s Mem.").) As a result, according to Plaintiff, the residual functional capacity assessment did not fully account for all of Plaintiff's impairments and the extent to which they preclude him from performing work-related activities, nor did the ALJ build a logical bridge between the evidence and her conclusion. (Pl.'s Mem. at 22, 24.)

Defendant responds that substantial evidence supports the ALJ's findings, and she did not err when evaluating the evidence and explaining the basis for her conclusions. (Def.'s Mot. Summ. J. Br. Supp. at 21-30 (ECF No. 25) ("Def.'s Mem.").) Specifically, Defendant contends the ALJ: (1) applied the correct legal standard in evaluating Plaintiff's subjective complaints; (2) properly incorporated Plaintiff's limitations in her residual functional capacity determination; and (3) did not err when evaluating the medical opinion evidence. (Def.'s Mem. at 21-30.) For the reasons that follow, this Court finds that the ALJ failed to apply the correct legal standards and remand is warranted.

**A. The ALJ Erred in Her Residual Functional Capacity Analysis When Evaluating Plaintiff's Subjective Complaints.**

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1). The residual functional capacity must incorporate impairments supported by the objective medical evidence in the record and those

impairments that are based on a claimant's consistent complaints. As of March 28, 2016, an ALJ must follow a revised two-step analysis in reviewing a claimant's subjective complaints. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029 (Mar. 16, 2016); *see also* SSR 16-3p, 2016 SSR LEXIS 4, 2017 WL 5180304 (Oct. 25, 2017) (correcting terminology relating to applicable date); SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1237954 (Mar. 24, 2016) (correcting effective date to March 28, 2016). The first step requires the ALJ to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce a claimant's pain or other related symptoms. SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *3. If the underlying impairment reasonably could be expected to produce a claimant's pain or other symptoms, the second part of the analysis requires the ALJ to evaluate a claimant's "symptoms such as pain and determine the extent to which [the claimant's] symptoms limit his or her ability to perform work-related activities." 2016 SSR LEXIS 4, [WL] at *4.

The ALJ's step-two evaluation must first consider the consistency between a claimant's statements and the objective medical evidence. 2016 SSR LEXIS 4, [WL] at *5. Unless the ALJ can determine that a claimant qualifies as disabled based solely on objective medical evidence, the ALJ must also consider other sources of evidence to determine consistency, including "statements from the [claimant], medical sources, and any other sources that might have information about the [claimant's] symptoms." 2016 SSR LEXIS 4, [WL] at *5-7. Based on the degree of consistency between a claimant's statements and the evidence of record, the ALJ should find either a higher or lower likelihood that the claimant can perform work-related activities. 2016 SSR LEXIS 4, [WL] at *8.

Furthermore, a claimant's subjective allegations are not, alone, conclusive evidence that he qualifies as disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit

has found that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, the ALJ found that although Plaintiff's impairments do cause some of his symptoms, "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . ." (R. at 21.) Upon review of the ALJ's decision and the record, the Court finds that the ALJ improperly considered the consistency between the evidence of record and Plaintiff's subjective complaints, including the extent to which Plaintiff could perform his activities of daily living. Therefore, remand is appropriate.

> 1. Relevant Medical Evidence.

For purposes of reviewing the ALJ's decision, the Court will summarize relevant details from the medical record with regards to Plaintiff's impairments as they relate to his subjective complaints.

On June 3, 2015, Plaintiff underwent a right total hip replacement due to osteoarthritis, which was reportedly healing well on examination at a follow-up visit the following month. (R. at 21, citing R. at 1003-04, 1627.) At that time, he reported swelling in his thumbs, right knee, and ankle, as well as morning stiffness, for which he was prescribed medication. (R. at 21, citing R. at 1004.) Plaintiff completed physical therapy and a home exercise program. (R. at 21, 669.) However, a physical examination showed synovitis in his hands, right knee, right ankle, and right toes. (R. at 21, 1005.) He treated these symptoms with prescription and over-the-counter medication, some of which was altered due to unwelcome side effects, and received injections in his wrist, hips, back, and right knee over the span of several years. (R. at 22-26, referencing R. at

492, 505, 567, 595-96, 629-30, 1006-07.) Physical examinations continued to show "synovitis in seven joints and an additional six tender joints." (R. at 22.) The ALJ noted that laboratory results showed improved inflammatory markers, although Plaintiff reported left ankle pain with full range of motion. (R. at 22.) He had tenderness in his hands and ankles and was issued a soft ankle brace for the left ankle. (R. at 22.)

Plaintiff underwent a left knee arthroscopy and lateral meniscal debridement on February 21, 2017. (R. at 22, citing R. at 502-04.) According to the ALJ, Plaintiff continued to treat for his arthritis at the same time, which was reportedly improved. (R. at 22, citing R. at 490.) However, Plaintiff presented to the emergency room in March 2017 for left wrist pain and swelling after cutting weeds with a machete. (R. at 22, citing R. at 583.) "A right wrist x-ray showed severe degeneration of the first [carpometacarpal] joint and chronic appearing fracture at the base of the fifth metacarpal." (R. at 22, referencing R. at 585-86.) On May 1, 2017, a subsequent trip to the emergency room occurred for a foot injury. (R. at 22, citing R. at 572-73.) Plaintiff continued reporting knee pain in September 2017, walked with an antalgic gait, and had patellar tracing. (R. at 22, citing R. at 496.) Upon examination of the right knee during a visit on December 1, 2017, Plaintiff had tenderness, an antalgic gait, and unstable ligamentous with medial to lateral movements. (R. at 22, 499.) Plaintiff's provider administered a right knee injection, prescribed medication, and referred him to physical therapy. (R. at 22, 502.) Plaintiff reported pain, stiffness, and swelling in his hands in February 2018, with some improvement in his knees, hips, and ankle pain in May 2018. (R. at 22-23, 530, 547.) In August 2018, the pain returned, "and laboratory

results showed evidence of high activity, which was consistent with 16 tender joints, and 10 swollen joints found on physical examination . . . ." (R. at 23, citing R. at 516, 520.)

In October 2018, Plaintiff reported left hip pain "that interfered with his daily activities." (R. at 23, citing R. at 1543.) The ALJ noted that he "had limited range of motion and a positive impingement sign, but he did not use an assistive device to ambulate." (R. at 23, citing R. at 1543.) X-rays of Plaintiff's lumbar spine showed "minimal degenerative disc disease, and a pelvis x-ray showed severe arthritis with marked acetabular changes and small fracture of femoral head collapse on the left." (R. at 23, citing R. at 1543-44.) Plaintiff received injections and was prescribed medications, which reportedly improved his symptoms. (R. at 23.)

In March 2019, Plaintiff again attended physical therapy and told his orthopedist that he felt bilateral lower extremity pain. (R. at 23, citing R. at 1547.) The ALJ summarized the examination results, which showed:

> an unstable left knee with valgus stress testing and medial joint space widening of 5 mm. There was also moderate patellar crepitus. At the right knee, there was moderate effusion and patellar tracing. [Plaintiff] walked with an antalgic gait, and he had moderate left hip pain. A left knee x-ray showed moderate degenerative changes including osteophyte formation, and subchondral sclerosis.

(R. at 23, citing R. at 1547-48.)

On April 18, 2019, Plaintiff underwent a left total hip replacement. (R. at 23, 1556.). Plaintiff attended physical therapy and seemingly felt better with medication and injections. (R. at 23, referencing R. at 1750-51.) In May 2019, he continued to have an antalgic gait and "marked effusion at the right knee," which showed osteoarthritis on x-ray imaging. (R. at 24, 979, 1566.) A subsequent MRI on Plaintiff's right knee showed the "body and posterior horn medial meniscus was degenerated . . . either due to chronic partial tear or degenerative change." (R. at 24, 1570.) Although he did well following the left hip replacement, Plaintiff arrived at the emergency room

on July 7, 2019 complaining of left hip pain. (R. at 24, 971.) An examination on July 9, 2019 showed Plaintiff walking with a cane and having tenderness in his left hip. (R. at 24, 1579.) Imaging revealed "moderate degenerative disc disease at L4-5, mild anterolisthesis at L4-5, and stable hip implants." (R. at 24.) Plaintiff presented again at the emergency room on October 10, 2019, for right knee pain. (R. at 24, 951.) X-rays showed "mild degenerative change" and that he walked with an antalgic gait. (R. at 24, 958.) Although his strength was intact, Plaintiff had "decreased sensation in the lateral leg and dorsum of the foot." (R. at 24.)

Plaintiff received another injection in the right knee in October 2019, which "felt wonderful." (R. at 24, 1328.) The ALJ noted, however, that Plaintiff "continued to have knee and hip pain," for which he was referred to a pain management specialist. (R. at 24, 1337.) On November 6, 2019, Plaintiff reported "using a cane, especially after prolonged sitting." (R. at 24.) According to the ALJ's summary, "[h]e had minimal hip pain, but there was lumbar tenderness and a positive straight leg raising at 45 degrees." (R. at 24, citing R. at 1574.) An MRI of Plaintiff's back on November 21, 2019, showed "mild multilevel changes, no significant canal compromise, and mild bilateral foraminal stenosis at L5-S1." (R. at 25, citing R. at 1590.)

On December 11, 2019, Plaintiff was administered another right knee injection. (R. at 25, 1580.) Four days later, Plaintiff presented again to the emergency room "for persistent knee and hip pain." (R. at 25, 1898.) His pain management specialist noted that medication provided eighty percent relief, but physical therapy only thirty percent relief. (R. at 25, 2182.) The ALJ noted how imaging from January 2020 continued to show "severe degenerative changes" in the bilateral hands, and "mild radiocarpal joint space narrowing that was slightly progressive" in the left wrist. (R. at 25.) "A cervical spine x-ray showed moderate narrowing of the C5-C6 intervertebral disc as well as anterior osteophyte formation and mild right C5-C6 osseous neural foraminal narrowing."

(R. at 25.) On February 4, 2020, Plaintiff reported "zero tender points and zero swollen joints on physical examination and he said the right knee pain had resolved with the steroid injection." (R. at 25, citing R. at 2266.) According to the ALJ, he continued to treat his symptoms with medication, which caused no significant side effects. (R. at 25.) As the ALJ remarked, however, Plaintiff's "right knee pain returned, and he said he was using a cane over long distances on March 27, 2020." (R. at 25, citing R. at 2788 (indicating date of treatment as March 25, 2020).) Although his balance and strength were adequate, he walked with an antalgic gait. (R. at 25, 2788.)

Plaintiff received an epidural steroid injection in his back on May 19, 2020, which he reported gave him fifty to sixty percent relief. (R. at 25, 2183.) The ALJ noted that this "procedure allowed him to do some daily activities with more ease, but he had trouble with mowing the lawn." (R. at 25.) He underwent a "lateral meniscectomy of the right knee on June 23, 2020; the surgical findings showed grade 3 changes of the medial patella and patellar median ridge as well as the lateral tibial plateau and grade 2 changes in the medial compartment." (R. at 25, citing R. at 2779.) He continued to treat with medication and on July 6, 2020, he reported no pain in the right knee. (R. at 25, 2311.) At that time, he was doing physical therapy and reported being able to ambulate better. (R. at 25, 2311.) However, Plaintiff's "symptoms started to return seven days before his next infusion," and he eventually developed "increasing left hip pain." (R. at 25, 2766.) Plaintiff "was dependent on the use of a walker and a cane for ambulation." (R. at 25, 2760.)

Imaging from August 2020 precipitated a left hip revision total hip replacement surgery on August 28, 2020. (R. at 26, 2742.) "[Plaintiff] transitioned from a walker to a cane on September 15, 2020, and he was able to shower daily." (R. at 26, 2727.) Plaintiff reported left hip and knee pain improvement with occasional symptoms following two months of physical therapy, medication, and infusions. (R. at 26, 2690, 2701.) He underwent "another right knee injection on

December 4, 2020, "and a right knee arthrocentesis on March 2, 2021." (R. at 26, 2691, 2696-97.) He reported improvement with medication as the day went on, and his doctors added to his regimen "for better symptom control." (R. at 26.) Plaintiff's medication changed "every few months" and he "continued to be treated by epidural steroid injections at the lumbar spine." (R. at 26, 2238, 2387, 2395)

Throughout her narrative discussion, the ALJ cited to significant documentation of radiological imaging and physical examinations depicting Plaintiff's varying degrees of degenerative changes in his hips, lumbar discs, and hands. (R. at 21, 24.) She noted that Plaintiff intermittently reported improvement with medication and physical therapy over the years, imaging continued to show degeneration, and physical examinations revealed tenderness, positive leg raising, and inconsistent use of an assistive walking device. (R. at 26.)

    2. *The Parties' Positions.*

As a second part of the ALJ's credibility assessment, the ALJ found that the medical evidence did not support Plaintiff's subjective complaints of pain. (R. at 21.) In his supporting and reply memoranda, Plaintiff argues that the ALJ erred by inaccurately describing Plaintiff's daily activities and the extent to which he could perform them, which resulted in a flawed residual functional capacity determination and inaccurate hypothetical to the vocational expert. (Pl.'s Mem. at 13, 15-17; Pl.'s Reply Mem. at 2 (ECF No. 18).) In particular, Plaintiff contends the ALJ erred by finding that Plaintiff was able to "handle his daily activities" by "routinely" doing yard work, using "ladders and lawn mowers," a "machete," and "cut[ting] firewood" without considering how Plaintiff either unsuccessfully does these tasks or requires assistance from others due to pain in his knee, back, and hip. (Pl.'s Mem. at 15-16, citing R. at 26.) According to Plaintiff, "[t]he ALJ neglected to consider that Plaintiff's sporadic yard work often led to aggravation of his symptoms

13

with increased pain for which he sought treatment. This is consistent with the objective evidence and can only support a finding that he is disabled as he is unable to consistently do this without exacerbation." (Pl.'s Mem. at 16.) Further, Plaintiff explains that "[t]he Fourth Circuit has long held that the ability to perform sporadic daily activities is not inconsistent with a claim for disability." (Pl.'s Mem. at 16 (citing *Mascio v. Colvin*, 70 F.3d 632, 636-37 (4th Cir. 2015); *Totten v. Califano*, 624 F.2d 10 (4th Cir. 1980); *Amavisca v. Berryhill*, 2018 U.S. Dist. LEXIS 187233, at *27 (W.D.N.C. Nov. 1, 2018).)

Defendant responds that the ALJ "correctly evaluated Plaintiff's subjective allegations in adjudicating Plaintiff's application" in accordance with the governing regulations. (Def.'s Mem. at 21.) According to Defendant, the ALJ sufficiently addressed the inconsistencies between Plaintiff's subjective complaints and his daily activities, and substantial evidence supports the ALJ's findings. (Def.'s Mem. at 22.) Moreover, Defendant contends that "Plaintiff's own reported activities even exceeded his [residual functional capacity] in at least one respect: he described using ladders in the course of daily activities," but the ALJ precluded their use in the residual functional capacity assessment. (Def.'s Mem. at 23.) Further, Defendant explains that the ALJ "expressly noted Plaintiff's description of reductions in his capacity to undertake various activities due to his physical impairments and related symptoms, including pain." (Def.'s Mem. at 23, citing R. at 21.) Examples of this include the ALJ's summary of the medical evidence depicting "the exacerbation in [Plaintiff]'s hip and knee symptoms in 2020 that precipitated difficulty ambulating." (Def.'s Mem. at 23, citing R. at 25-26.) Nonetheless, Defendant contends the ALJ "was entitled to evaluate how Plaintiff's own self-reports of his own functioning either supported, or did not support, his subjective statements to his own limitations." (Def.'s Mem. at 23-24.)

For the reasons that follow, and on review of the ALJ's decision and the record, the Court finds that the ALJ failed to consider Plaintiff's daily activities and the extent to which he could perform them. Moreover, the objective medical evidence in the record and the evidence of Plaintiff's manner of treatment do not support the ALJ's findings, absent further explanation from the ALJ that draws a logical bridge between this evidence and her conclusion. Consequently, the Court finds that the ALJ failed to properly consider Plaintiff's relevant functions in crafting Plaintiff's residual functional capacity and failed to provide a narrative that substantially supported her findings. Accordingly, remand is appropriate.

> 3. *The ALJ Failed to Properly Consider the Extent to Which Plaintiff Performed His Activities of Daily Living.*

In addressing daily activities, the ALJ must consider both the types of activities that a claimant can perform and the extent to which a claimant can perform them. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). Further, the ALJ must "*both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from [that] evidence to his conclusion." *Id.* (emphasis and alteration in original) (internal quotation marks omitted). Otherwise, the court is "left to guess" how the ALJ arrived at her conclusion and cannot meaningfully review the ALJ's determinations. *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In this case, the ALJ failed to satisfy both requirements and did not sufficiently build a logical bridge from the evidence to her conclusion. (R. at 21-27.) While the ALJ considered factors in addition to the objective medical evidence to discount Plaintiff's subjective complaints of disabling limitations, the ALJ did not sufficiently explain how the remaining evidence she cited supported her assessment. The Fourth Circuit explained in *Arakas v. Commissioner* that "[a] claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities." 983 F.3d 83, 101 (4th Cir. 2020). In her decision, the

15

ALJ here relied extensively on Plaintiff's self-reported ability to do yard work. (R. at 21-22, 24-28.) Though she acknowledged that Plaintiff "had trouble mowing the lawn," the ALJ failed to explain how Plaintiff's purported ability to perform this activity "showed that he could sustain a full-time job." (R. at 25); *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 269-70 (4th Cir. 2017). *See also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (holding that "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"); *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) ("[T]he ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain.").

Indeed, the ALJ's characterization of Plaintiff's ability to do yard work indicates the ALJ did not properly assess Plaintiff's subjective statements and the record evidence. In her decision, the ALJ found that Plaintiff could "handle his activities of daily living[,]" such as continuing to "do yard work, using a machete, and helping his mother around the house." (R. at 26, 28.) She also cited to Plaintiff's ability "to bathe and dress himself" and "perform household tasks." (R. at 27.) She added that there was "there is no evidence of falls or inability to effectively use his upper extremities while receiving treatment for his knee and low back." (R. at 28.)

However, the ALJ also acknowledged instances in which Plaintiff injured himself or otherwise exacerbated the pain in his back, hands, and hip after doing yard work. (R. at 26, 81.) For instance, the ALJ stated that medical records from October 30, 2015, indicated that Plaintiff had "difficulty with his usual activities of cutting firewood due to thumb pain; he had an increase in pain since doing it, but it was slowly improving." (R. at 21-22.) Nonetheless, he took medication to manage flare-ups, "remained active, and was helping his mother around the house and with yard work." (R. at 21-22.) During a visit on March 3, 2017, Plaintiff remarked that his arthritis was "a lot better. He was exercising and remaining active." (R. at 22.) Weeks later, however, on March

29, 2017, Plaintiff presented to the emergency room following an accident with a machete while cutting leaves, and again received emergency care on May 2, 2017, after injuring his foot while cutting a tree. (R. at 22.)

Moreover, Plaintiff testified that his brother or nephew would help him do the yard work, and that his mother-in-law or wife did the housework, including shopping, cooking, cleaning, and laundry. (R. at 81.) This is consistent with Plaintiff's answers in his adult function report, in which he stated that his "wife cooks, brother do [sic] yardwork." (R. at 323.) Although capable, Plaintiff also testified to having difficulty in bathing himself. (R. at 123) ("Getting in and out of the tub, sometimes I do need assistance. It depends on how bad the arthritis is.") The ALJ even acknowledged Plaintiff's testimony that he "had a tendency to lean to the left with walking and standing, and he ends up falling." (R. at 21.)

In terms of "helping his mother around the house" Plaintiff testified at his prior administrative hearing that his "only job was to make sure she didn't fall and make sure she ate." (R. at 84.) Plaintiff added that he "had to never bathe her or nothing like that . . . [a]nd make sure she took her medicine . . . ." (R. at 84.) When asked if this involved "real lifting or carrying or anything like that[,]" Plaintiff responded, "No. No. If she fell or needed help getting up or something, yes. I had to lift her up then." (R. at 84.) The ALJ proceeded to ask Plaintiff if any falls occurred while he was supervising his mother, and Plaintiff answered: "No falls, but mostly just getting up, going to the bathroom and stuff from out of her chair. Mainly, like in the bathroom or something, if she was to get weak while she is sitting in there. That was only once in a while where I would have to come and help her with standing up." (R. at 85.) Plaintiff affirmed that this did not happen frequently or "too often." (R. at 85.)

17

Further, the ALJ remarked that "[t]here was no evidence that [Plaintiff] had difficulty bending or that he was observed in pain with bending his knees and hips to sit." (R. at 28.) However, the record appears to contradict this finding, given the evidence that Plaintiff's hip continued to cause him pain after doing yard work, leading to a trip to the emergency room on July 7, 2019. (R. at 24.) The ALJ acknowledged that Plaintiff told emergency room personnel that "[h]e could not sit in one position for too long and he had difficulty sleeping." (R. at 24.) He also presented to the emergency room on October 10, 2019, for right knee pain and was prescribed an opioid pain reliever and recommended for an epidural steroid injection, which occurred on October 29, 2019. (R. at 24.) While Plaintiff "felt wonderful" following the injection, he attended an appointment a few days later on November 1, 2019, and reported that he "continued to have knee and hip pain," which resulted in a referral to a pain management specialist. (R. at 24.) The ALJ proceeded to note that Plaintiff used a cane, "especially after prolonged sitting," had "minimal hip pain," and demonstrated "a positive straight leg raising at 45 degrees." (R. at 24.) Thus, the ALJ references medical records which indicate at least some evidence that Plaintiff experienced ongoing pain in bending his knees and hips to sit, which undermines the basis for her findings.

Consequently, the Court finds error in the ALJ's characterization of Plaintiff's subjective complaints within the context of Plaintiff's activities of daily living. While the ALJ considered factors in addition to the objective medical evidence to discount Plaintiff's subjective complaints of disabling limitations, the ALJ did not sufficiently explain how the remaining evidence she cited supported her assessment. Indeed, for each activity of daily living identified by the ALJ, the ALJ cited to Plaintiff's testimony and medical record evidence supporting limitations on those activities. Although the ALJ acknowledged Plaintiff's lower extremity issues, the ALJ failed to describe how the restrictions included in the residual functional capacity addressed or

accommodated these limitations. In doing so, she failed to adequately reconcile the contradictions and explain her ultimate conclusions, which frustrates meaningful review. *See Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (explaining that an ALJ "must both identify evidence that supports his conclusion and build an accurate and logical bridge from [that] evidence to his conclusion.") As a result, this Court is left to guess about how the ALJ arrived at her conclusions regarding Plaintiff's ability to perform certain relevant functions. It is recommended that remand, therefore, is necessary to determine what the ALJ intended.

## V. CONCLUSION

After careful consideration of the record, the Court recommends remand of this case to the ALJ with instructions to consider and weigh all of the relevant evidence of record in accordance with the Act. Given that this determination overlaps with the remaining issues raised by Plaintiff, and in light of the recommendation of remand, the remaining issues need not be further addressed by the Court at this time. None of this necessarily means that Plaintiff is disabled under the Act, and the Court expresses no opinion on that question at this time.

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 15) be GRANTED, Defendant's Motion for Summary Judgment (ECF No. 17) be DENIED, and that the final decision of the Commissioner be REVERSED and REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Report and Recommendation.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen**

**(14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                                    /s/ MRC  
                                                    Mark R. Colombell  
                                                    United States Magistrate Judge

Richmond, Virginia  
Date: January 11, 2023